### YOUNIS BROTHERS & CO.

v.

### CIGNA WORLDWIDE INSURANCE COMPANY.

### The ABI JAOUDI AND AZAR TRADING CORPORATION

v.

### CIGNA WORLDWIDE INSURANCE COMPANY.

Civ. A. Nos. 91–6784, 91–6785.

United States District Court, E.D. Pennsylvania.

Sept. 25, 1995.

See also 882 F.Supp. 1468.

John J. Seehousen, Langhorne, PA, for plaintiffs.

David R. Strawbridge, Cozen and O'Connor, Philadelphia, PA, for defendant.

## MEMORANDUM

O'NEILL, District Judge.

### I. *Introduction*

With respect to the procedural history of these cases reference is made to this Court's November 16, 1994 memorandum reported at *Younis Bros. & Co., Inc. v. Cigna Worldwide Ins. Co.*, 882 F.Supp. 1468 (E.D.Pa.1994).

Currently before the Court are the post-trial motions of the parties.

Defendant CIGNA argues that the following entitle it to judgment as a matter of law:

1. The suit limitation clause contained in the fire policies issued by defendant to plaintiffs bars plaintiffs' claims with respect to those policies;

2. Plaintiffs failed to make out a prima facie case establishing their right to coverage under the insurance policies;

3. The war risk exclusion provisions contained in the policies bar plaintiffs' claims;

4. Neither defendant's refusal to pay plaintiffs' claims nor its manner of investigating those claims can constitute bad faith under 42 Pa.S.C.A. § 8371.

Defendant argues that the following entitle it to a new trial on plaintiffs' contract and bad faith claims:

5. The Court committed reversible error in instructing the jury with respect to ambiguity in the insurance contracts;

6. The Court committed reversible error in instructing the jury with respect to plaintiffs' alleged fraud and noncooperation.

Defendant also asserts the following:

7. The Court's decision to allow plaintiff AJA to assert its Harbel fire loss claim constituted reversible error;

8. AJA forfeited fire loss coverage with respect to the Harbel location by violating the notice provision contained in the Harbel fire policy.

Plaintiffs argue that they are entitled to a new trial as to those issues upon which they did not prevail because plaintiffs were prejudiced by this Court's determination:

1. Not to disqualify the jury panel due to the allegedly improper voir dire and striking of minority persons from the jury pool by defendant's counsel.[1]

Plaintiffs also argue that this Court erred by:

2. Failing to rule that as a matter of law the suit limitation policy contained in the fire policies did not bar their suit;

3. Failing to rule as a matter of law that the coverage limits of the policies were those amounts contained in the policies' renewal endorsements;

4. Limiting plaintiffs' cross-examination of defendant's witness John Smith;

5. Failing to compel defendant to produce unredacted copies of reports which defendant introduced into evidence.

Plaintiff AJA argues that the Court erred by:

6. Failing to rule as a matter of law that—with respect to AJA's fire and burglary policies—defendant was liable for the entire amount of coverage stated in the renewal endorsements;

7. Refusing to award plaintiff AJA partial judgment in the amount of the damages stipulated at the Harbel supermarket and

---

1. A favorable ruling on this motion presumably would require a new trial on all issues, not the limited new trial sought by plaintiffs.

warehouse, the Randall Street supermarket and wholesale warehouse, the Freeport administrative offices and bonded warehouse and the Old Road manager's residence;

8. Incorrectly charging the jury with respect to the issue of plaintiff AJA's alleged fraud.

Plaintiff Younis argues that with respect to its bad faith claim pursuant to 42 Pa.S.C.A. § 8371 the Court erred by:

9. Failing to permit the jury to determine whether Younis was entitled to recover interest, counsel fees and costs and the amount of those sums;

10. Excluding testimony regarding defendant's conduct;

11. Charging the jury that it could award punitive damages against defendant only if it first determined that defendant's actions were outrageous and permitting the jury to hear additional evidence regarding defendant's conduct after the jury had determined that defendant had acted in bad faith;

12. In failing to incorporate findings of facts in this Court's memorandum dated November 16, 1994 and in failing to award Younis damages pursuant to § 8371.

Plaintiff Younis also argues that this Court erred in refusing to award Younis expenses which it incurred allegedly due to defendant's actions.

## II. *Discussion*

### Motion For Judgment NOV

Defendant seeks judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. Rule 50(b) which provides:

Whenever a motion for a judgment as a matter of law made at the close of all evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to the later determination of the legal questions raised by the motion.... [I]f a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law. If no verdict was returned, the court may, in disposing of the renewed motion, direct the entry of judgment as a matter of law or may order a new trial.

The Court of Appeals has held that "[w]hen deciding a motion for judgment n.o.v., the trial judge must determine whether the evidence and the justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir.1987) [citing *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, 789 F.2d 253 (3d Cir.1986)], *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The standard is the same whether the motion is one for a directed verdict or for judgment n.o.v. The standard for granting a Rule 50 motion is also identical for the trial court and upon appeal. *See Gilpin v. Langan*, 789 F.2d 1034 (3d Cir.1986). With respect to that standard the Court of Appeals has stated that the court:

must examine the record in a light most favorable to [the verdict winner], and review the specific evidence in the record and all inferences reasonably capable of being drawn therefrom. [The court] must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.... [I]t should be granted sparingly and circumspectly. Nevertheless the federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978) (citations and quotations omitted).

### Suit Limitation Clause

Each of the fire policies issued by defendant to plaintiffs contains a suit limitation clause which provides:

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity ... unless

commenced within twelve months next after inception of the loss.

Plaintiffs filed suit on all claims except the Harbel market fire loss claim on October 31, 1991. Plaintiff AJA first asserted its Harbel claim during trial (February 1994) and defendant argues that I abused my discretion in permitting AJA to assert the claim at that time. It is not disputed that each of plaintiffs' fire losses occurred before October 30, 1990.

Plaintiffs argue that their claims are not barred because: (1) the closure of Liberian courts between June 29, 1990 and November 4, 1991 voided the suit limitation clauses; and (2) the actions of defendant's agents and employees estop defendant from asserting the clauses as a defense. Plaintiff AJA also argues that this Court acted properly when it allowed AJA to amend its pleadings to assert its Harbel market fire loss.

■ Upon review of the record and of the authorities cited by the parties I conclude that—excluding the Harbel market fire claim—the suit limitation clauses do not bar plaintiffs' fire loss claims. Because of my determination with respect to defendant's war risk exclusion defense I need not address the propriety of my decision to permit plaintiff AJA to assert its Harbel market fire loss claim; any references to plaintiffs' "losses" or "claims" in the following suit limitation discussion excludes the Harbel market fire claim.

Plaintiffs assert that disputes involving the suit limitation clauses are controlled by Liberian law which looks to American common law.[2] The parties agree that there is no conflict between Liberian law and Pennsylvania common law on this issue.

In *Semmes v. Hartford Ins. Co.,* 80 U.S. (13 Wall) 158, 20 L.Ed. 490 (1871), the Supreme Court determined the effect of a twelve month suit limitation clause when a citizen of Mississippi brought suit against a Connecticut insurance company in 1866 for coverage on a loss sustained in 1860. The Court held that the Civil War, which it described as a war between the countries in which the parties resided, imposed a disability on plaintiff which "relieve[d] him from the consequences of failing to bring suit within twelve months after the loss, because it rendered a compliance with that condition impossible and removes the presumption which that contract says shall be conclusive against the validity of the plaintiff's claim." *Id.,* 80 U.S. at 161. Since the suit limitation provision was a term negotiated by the parties and not a legislatively enacted statute of limitations the Court held that the plaintiff's claim was timely because it was brought within the applicable statutory period. *Id.*

The suit limitation provisions in the present fire policies are required by Pennsylvania law to be included in all policies insuring property within the Commonwealth. However, the insured property in the present case was located in Liberia and the policies were issued there; therefore, I will regard the limitations as part of a private agreement between the parties, as was the case in *Semmes.*

This case is not factually on all fours with *Semmes.* Liberia was not at war with the United States; Mr. Semmes had no access to the courts in the United States whereas plaintiffs did; Mr. Semmes remained in Mississippi—the principals of plaintiffs, who were Lebanese nationals, fled to Lebanon; and *Semmes* does not reveal that the insured's property was in an area ravaged by war as was plaintiffs' property (see discussion hereinafter). But *Semmes* and other cases,[3] although involving differing facts, are instructive because they have a common thread: they all focus on the disability inevi-

---

**2.** Plaintiffs may have abandoned this position by asserting at oral argument that I am not bound by the recent Liberian Supreme Court decision *Picasso Cafeteria & Spanish Gallery v. Mano Ins. Corp.,* July 28, 1995, 44–55, wherein the Liberian Supreme Court determined that a civil war existed in Liberia at the time the plaintiffs in these cases sustained their losses.

**3.** *Cf. Osbourne v. United States,* 164 F.2d 767 (2d Cir.1947) (statute of limitations equitably tolled where plaintiff was held in Japan during the Second World War and therefore unable to file his claim in court); *First Nat. Bank of Pittsburgh v. Anglo–Oesterreichische Bank,* 37 F.2d 564 (3d Cir.1930) (statute of limitations will not run against alien enemy while courts are closed to him).

tably imposed on a war-affected claimant who is required by contract or statute to institute suit within a specific period of time.

The present policies are silent upon the question where suit may or must be brought. However, where a policy insures property located in a foreign country and is issued in that country surely it is not unreasonable to conclude that the parties contemplated that a local forum would be available to the insured if the need arose to assert a claim. Given the havoc which prevailed in Liberia during the pertinent time period (see discussion hereinafter) it is questionable whether plaintiffs were in a position to secure the information needed to file a claim and institute suit within the twelve month period. In any event, defendant drafted the policies. If it wished to impose the draconian requirement that when the judicial system of the locus country is shut down foreign insureds must sue in the United States or forfeit their claims, defendant could, and should, have said so explicitly. I conclude that plaintiffs' claims are not barred by the suit limitation provisions.

*War Risk Exclusion*

CIGNA argues that it is entitled to judgment because the evidence viewed in the light most favorable to plaintiffs establishes as a matter of law that: (1) an insurrection or civil war existed in Liberia at the time plaintiffs sustained their losses; and (2) the insurrection or civil war caused plaintiffs' losses within the meaning of the war risk exclusion contained in plaintiffs' policies. Plaintiffs respond that: (1) the evidence does not establish defendant's contentions as a matter of law; and (2) the language contained in my charge—to which defendant did not object—permitted the jury to find in plaintiffs' favor based upon the evidence presented at trial.

■ As an initial matter I conclude that plaintiffs' second argument is without merit. The fact that the jury returned a verdict in favor of plaintiffs consistent with a charge that was not objected to does not establish that the verdict was supported by the minimum quantum of evidence which Rule 50

requires. The failure of a party to object to a jury instruction does not make that instruction the law of the case. *See* Wright & Miller, Federal Practice and Procedure 2d § 2537. This Court must determine whether the evidence could have supported a jury verdict with respect to a properly formulated charge whether or not such a charge was delivered to the jury. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988).

■ The entry of judgment n.o.v. in favor of defendant insurance company is inappropriate if ambiguity exists in a dispositive provision of an insurance contract which defendant drafted and a permissible interpretation of the ambiguous clause would permit a jury to find in favor of plaintiff. Under federal law "[i]t is for the court, as a matter of law, to determine whether ambiguity exists in a contract." *Kiewit Eastern Co. v. L & R Constr. Co.*, 44 F.3d 1194, 1199 (3d Cir.1995) [citing *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986) ]. Under Pennsylvania law a provision of a contract is ambiguous if its terms are susceptible to more than one interpretation.[4]

The fire policies and the extended coverage endorsements appended to the policies provide that defendant is liable for fire damage generally and for burglary and looting directly caused by riot and civil commotion. The fire policies also provide that defendant is not liable for:

> loss by fire or other perils insured against in this policy caused, directly or indirectly, by: (a) enemy attack by armed forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; (b) invasion; (c) insurrection; (d) rebellion; (e) revolution; (f) civil war; (g) usurped power; (h) order of any civil authority except acts of destruction at the time of and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this policy; (i) neglect of the Insured to use all reasonable means to save and preserve the property at and after a loss, or

---

4. None of the parties asserts that Liberian law differs from Pennsylvania law in this respect.

when the property is endangered by fire in neighboring premises; (j) nor shall this Company be liable for theft.

CIGNA Fire Policy, lines 10–24. In addition, plaintiff AJA maintained a burglary policy, an accounts receivable policy and a money and securities policy. Each of these policies contained a war risk exclusion clause. AJA's burglary policy and the money and securities policy excluded "loss due to war . . . civil war, insurrection, rebellion, revolution. . . ." CIGNA Merchantile Open Stock Burglary Policy, ¶ (b); CIGNA Money and Securities Policy, Exclusions, ¶ (e). AJA's accounts receivable policy excluded coverage for losses "caused by or resulting from . . . insurrection, rebellion, revolution, civil war, usurped power." CIGNA Accounts Receivable Policy, Exclusions, ¶ (g).

In *TRT/FTC Communications, Inc. v. Insurance Co. of Pennsylvania, Inc.*, 847 F.Supp. 28, 30 (D.Del.1991) *aff'd*, 9 F.3d 1541 (3d Cir.1993), the Court determined that a similar war risk exclusion provision—appearing in an all-risk property insurance contract governed by California or Washington law— was clear and unambiguous. That policy language was as follows:

This policy does not insure against loss or damage caused by or resulting from:

1) Hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending or expected attack (A) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (B) an agent of any such government, power, authority or forces;

\* \* \* \* \* \*

3) Insurrection, rebellion, revolution, civil war, usurped power, acts of terrorism, sabotage, or action taken by governmental authority in hindering, combating or defending against such occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

*Id.* at 30.

In my view the *TRT* Court's holding does not conflict with the district court determination affirmed in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 1005 (2d Cir.1974). In *Pan American* the defendant insurance company asserted in the alternative that plaintiff's loss resulted from one of the conditions covered in three separate clauses of the war risk exclusion contained in plaintiff's policy. One of those clauses excluded coverage in the case of "war, . . . civil war, revolution, rebellion, insurrection or warlike operations, whether there be a declaration of war or not." Noting that defendant claimed—in the alternative—that a number of exclusion clauses barred plaintiff's claim the Court of Appeals for the Second Circuit concluded that "we can infer from [defendant's] reliance on so large a number of exclusions that the all risk insurers recognize that each of the exclusions is ambiguous or has only uncertain application to the facts." *Id.* at 1005.

The concepts of ambiguity and vagueness are distinct. As one commentator has reasoned:

a word is vague to the extent that it defines not a neatly bounded class but a distribution about a central norm. Thus the word *green* is vague to the extent that it shades into yellow at one extreme and into blue at the other, so that its applicability to marginal situations is uncertain. Ambiguity is an entirely distinct concept. A word may have two entirely different connotations, so that it may be at the same time both appropriate and inappropriate. Thus the word *light* is ambiguous when considered in the context of dark feathers.

E. Allen Farnsworth, Contracts, § 7.8 (1982) (citations and footnotes omitted) (emphasis in original). I read the *Pan American* Court's use of the phrase "has only uncertain application to the facts" to mean that some of the exclusion provisions may have been vague rather than ambiguous.

I conclude that the *Pan American* Court did not consider the term "insurrection" ambiguous because—consistent with the clear

weight of authority—the Court defined the term as a violent uprising by a group or movement acting for the specific purpose of overthrowing the constituted government and seizing its powers. *Pan American,* 505 F.2d at 1017; *see Holiday Inns, Inc. v. Aetna Ins. Co.,* 571 F.Supp. 1460, 1487 (S.D.N.Y. 1983); *see also Home Ins. Co. of New York v. Davila,* 212 F.2d 731, 736 (1st Cir.1954) (an insurrection occurs where a movement acts to overthrow the constituted government and to take possession of its inherent powers). My inquiry into whether plaintiffs' claims are barred by the war risk exclusion provisions will focus on whether an "insurrection" existed in Liberia at the time plaintiffs' suffered their losses because "insurrection" is the most rudimentary form of the type of civil commotion which in progressive stages may become "rebellion," "revolution" and "civil war." *See Pan American,* 505 F.2d at 1017; *Davila,* 212 F.2d at 736.

■ The parties agree that Liberia experienced political and social turbulence during 1989 and 1990. Between June and October of 1990 plaintiffs suffered losses to insured property located in Monrovia and Harbel. The issue before this Court is whether as a matter of law that turbulence rose to the level of insurrection as defined in the war risk exclusion provisions contained in the insurance policies and if it did whether that insurrection was responsible for plaintiffs' losses as causation is defined in those provisions. Defendant bears the burden of establishing that its war risk exclusion applies to plaintiffs' claims.

■ In 1989 Charles Taylor led an armed movement that challenged the civil authority of the Liberian government headed by President Samuel Doe. In early 1990 Taylor's forces split into two factions; the National Patriotic Front of Liberia (NPFL) headed by Taylor and the Independent National Patriotic Front of Liberia (INPFL) headed by Prince Johnson, a former Taylor follower. Defendant's witnesses testified that they heard both Taylor and Johnson state an intention to overthrow the government of President Doe. Manchester Guardian correspondent Mark C. Huband testified that he met with Taylor and that Taylor "stated very clearly ... that his aim was to rid the country of the government of Samuel Doe and to replace it with himself as head of state." Further, a witness presented by plaintiffs— Peter Jallah, Director of Economic Crime Investigation Department, Liberian Ministry of Justice—testified that he heard Taylor speak on BBC radio about overthrowing the Doe government.

In early June, Taylor's forces engaged government troops near Harbel and subsequently established control over the town which is thirty-five miles from Monrovia. By July, 1990 forces under Charles Taylor and Prince Johnson engaged government forces in and around Monrovia. In August, 1990 the Economic Community of West African States (ECOMOG) despatched six thousand troops to Monrovia to establish a cease fire between the government and the rebel factions. On September 9, 1990 Johnson's forces captured President Doe who subsequently was killed. By October 1990 ECOMOG forces gained control of Monrovia. On November 22, 1990 a national unity government headed by Interim President Amos Sawyer took office. By February, 1991 a cease fire agreement between Taylor, Johnson and ECOMOG had been signed.

During this conflict United States Marines evacuated American citizens from Monrovia and the Liberian courts closed. On June 27, 1990 government troops fired upon a peace demonstration in Monrovia. After that incident the Monrovia police and fire departments' operations were so curtailed that they essentially ceased to function. The evidence also indicates that at least some of the damage plaintiffs suffered was caused by armed men who appeared to be soldiers.

After reviewing the record in a light most favorable to plaintiffs, I conclude that the evidence establishes—as a matter of law— that the events which occurred in Liberia between late 1989 and February 1991 constituted—at least—an insurrection. CIGNA, therefore, is not liable to plaintiffs for any damage which is attributable to the insurrection under the causation language contained in the policies.

■ The war risk provisions contained in the various policies provide that defendant is not liable for losses which are "directly or indirectly caused by insurrection ..."; loss due to ... insurrection ... or "caused by or resulting from ... insurrection...." Such language has been judicially interpreted to articulate a unique proximate cause test excusing an insurance company from providing coverage to its insured if the insurrection was the efficient cause or the predominant and determining cause of the loss. *See Standard Oil Co. v. United States*, 340 U.S. 54, 55 n. 1, 71 S.Ct. 135, 136 n. 1, 95 L.Ed. 68 (1950) (construing a policy that excluded from coverage "all consequences of hostilities or warlike operations"); *Pan American*, 505 F.2d at 1006 (construing a provision that excluded damage "due to or resulting from" under the *Standard Oil* standard). Such cause need not be the cause nearest in time or place to the loss but must be "that cause which is most nearly and essentially connected with the loss as its efficient cause." *See Standard Oil*, 340 U.S. at 58, 71 S.Ct. at 137; *Insurance Co. v. Boon*, 95 U.S. 117, 24 L.Ed. 395 (1877); *see also TRT/FTC Communications, Inc. v. Insurance Co. of Pennsylvania, Inc.*, 847 F.Supp. 28 (D.Del.1991), *aff'd*, 9 F.3d 1541 (3d Cir.1993) (looting is caused by military hostilities if the looting was "enabled" by those hostilities and would not have otherwise occurred).

■ Courts hold that the efficient cause standard is not susceptible to mechanical application but requires "common sense and reasonable judgment as to the source of the loss alleged." *Blaine Richards & Co., Inc. v. Marine Indemn. Ins. Co. of America*, 635 F.2d 1051, 1054 (2d Cir.1980); *see also Ope Shipping, Ltd. v. Allstate Ins. Co., Inc.*, 521 F.Supp. 342, 349 (S.D.N.Y.1981), *aff'd in part*, 687 F.2d 639 (2d Cir.1982), *cert. denied sub nom., Underwriters at Lloyds v. Ope Shipping*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983); *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*, 258 N.J.Super. 167, 609 A.2d 440 (1992), *cert. denied*, 134 N.J. 481, 634 A.2d 528 (1993). As the Court in *International Dairy Eng'g Co. of Asia, Inc. v. American Home Assurance Co.*, 352 F.Supp. 827, 828 (N.D.Cal.1970), noted in the context of marine insurance, standard war risk exclusion clauses

reflect[ ] the general recognition that war creates perils vastly greater than and different from ordinary ... risks and that such risks are expected to be covered by separate war risk insurance which has a premium schedule commensurate with the greater risks.

■ The evidence establishes that rebel forces fought government troops in and around Harbel in late May and early June, 1990. The AJA supermarket at Harbel was looted sometime between June 5 and 8, 1990. At one point during this fighting rebel troops forced their way into the supermarket at Harbel and forced it to close. No witness observed the actual looting of the supermarket but a witness testified that he passed the supermarket on June 5 or 6 while transporting fuel for rebel troops and noticed that it had been broken into. AJA employees left Harbel between June 8 and June 14. When one of the employees returned to the supermarket in July or August he observed that it had been broken into and observed dead bodies lying inside.

I conclude as a matter of law that the looting and damage of the AJA Harbel supermarket would not have occurred in the absence of the insurrection that gripped Liberia in 1990 and that that insurrection was the efficient cause of the looting and damage to the supermarket.

Plaintiffs' properties in Monrovia sustained damage between August 19 and October 30, 1990. Evidence established that rebel factions under Charles Taylor and Prince Johnson clashed with government and ECOMOG troops in and around Monrovia from July through the end of October, 1990. On September 9, 1990, rebel forces captured President Doe. After October 1990 ECOMOG peacekeeping forces gained control of Monrovia and Doctor Amos Sawyer was installed as Interim President on November 22, 1990. In late June, 1990 the Monrovia police and fire departments' operations were so curtailed that they essentially ceased to function. The courts in Monrovia closed and water and electrical service was curtailed. Several wit-

nesses testified to the general lawlessness which gripped Monrovia after the collapse of civil authority.

It is uncontroverted that plaintiffs' properties were damaged during this time. Some of the properties appear to have been looted by men wearing military uniforms and some appear to have been looted by groups of civilians. Witnesses also testified that many businesses in Monrovia were looted and damaged by fire during this period as soldiers and civilians sought food and other necessities. During this period Monrovia also contained a substantial population of refugees. One witness testified that he observed people eating grass and another testified that after joining a rebel faction he repeatedly broke into plaintiff AJA's Freeport warehouse with other rebel soldiers to loot the warehouses contents.

I conclude as a matter of law that the looting and damage of plaintiffs' properties by both soldiers and civilians was the direct result of the insurrection that gripped Liberia in 1990 and that this looting was compounded by the breakdown of civil authority in Monrovia which was itself directly caused by the insurrection. I therefore conclude that the insurrection that existed in Liberia in 1990 was the efficient cause of the losses plaintiffs sustained to their Monrovia property.

Accordingly, I conclude that defendant is entitled to judgment n.o.v. under the war risk exclusion clauses contained in the policies with respect to plaintiffs' claims in both Harbel and Monrovia.

Alternatively, I reach the same result applying Liberian law. On July 28, 1995, the Liberian Supreme Court issued its opinion in *Mano Ins. Corp. v. Picasso Cafeteria and Spanish Gallery,* July 28, 1995, 44–55, which reversed a lower court's determination that losses sustained to the Picasso Cafeteria and Spanish Gallery on June 25, 1990 resulted from looting and vandalism and were recoverable under specified peril policies which covered losses from burglary as evidenced by forcible entry and losses from civil commotion. To support its claim the Picasso Cafeteria and Spanish Gallery submitted a police confirmation/clearance dated July 4, 1991

stating that a Mr. Padilla "reported that Picasso Cafeteria & Restaurant located on Center Street, City of Monrovia was burglarized/looted and damaged during the civil commotion." *Id.* at 53. The Picasso policies did not contain war risk exclusions.

The Liberian Supreme Court—appearing to adopt a rule that differs from the majority rule in the United States—held that the Picasso Cafeteria and Spanish Gallery had failed to prove that its losses occurred as a result of burglary or civil commotion because the losses occurred during hostilities in Monrovia that amounted to a civil war. The Supreme Court stated:

> We take it that … the reported injury took place during the civil commotion, according to the police report. The question then is whether what have had in the country is a civil commotion or a civil war. We have witnessed an armed struggle between opposing and contending forces for the control of the government as opposed to an uprising of citizens or a mere insurrection. To our mind the civil conflict was an armed one between opposing and contending forces; and so we have a situation of a civil war and not a civil commotion. The loss sustained by [the Picasso Cafeteria and Spanish Gallery] therefore arose from the general effects of the civil war when the … premises were burglarized/looted. The [insurance company] has averred that the damage suffered by the [insured] grew from the civil war and that the policies carry no war coverage. The records support this position … which impels us to hold that the [insured's] claim does not find support under the Cafeteria policies.

*Id.* at 54. In so holding the Liberian Supreme Court appears to hold that the terms civil commotion, insurrection and civil war describe events which neither coexist nor overlap.

In *Mano,* the Liberian Supreme Court also adopted a broad formulation of proximate cause in a specified peril policy that did not cover war loss and denied an insured coverage for all property losses that "arose from the general effects of the civil war." *Id.*

*Insurer Bad Faith*

In 1990, the Pennsylvania Legislature created a statutory cause of action against insurers who act in bad faith toward their insureds. That statute, which became effective on July 1, 1990, and is codified at 42 Pa.C.S.A. § 8371, provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

There is no legislative history that specifically concerns this statute, which was enacted as part of a comprehensive insurance bill.

To prevail in a claim brought pursuant to § 8371 an insured "must show that the defendant did not have a reasonable basis for denying benefits under the policy and that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky v. Prudential Property & Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (citations omitted). Further, Pennsylvania courts hold that a plaintiff must establish bad faith by clear and convincing evidence. *See id.* (citations omitted).

Defendant argues that as a matter of law its decision to deny plaintiffs' claims cannot constitute bad faith. In view of my conclusion that the war risk exclusion clause contained in the policies bars plaintiffs claims, I agree.[5]

The courts which have dealt with § 8371 have not clearly defined the circumstances under which an insurer's handling of a claim may give rise to § 8371 liability.[6] Courts have held that the Legislature enacted § 8371 to curtail bad faith practices on the part of insurers by affording insureds a cause of action that is separate and independent from the claim on the insurance contract. *See Hofkin v. Provident Life & Accident Ins. Co.*, No. 93–1044, 1995 WL 394118 at *7, 1995 U.S. Dist. LEXIS 9447 at *19–20 (E.D.Pa. June 30, 1995); *Margolies v. State Farm Fire & Casualty Co.*, 810 F.Supp. 637, 641–42 (E.D.Pa.1992) (citations omitted). Claims under § 8371 remain viable even if the statute of limitations has run on the contract claim, *Margolies*, 810 F.Supp. at 641, or if the insured has failed to file suit within the period required by the policy. *Hofkin*, 1995 WL 394118 at *7, 1995 U.S. Dist. LEXIS 9447 at *19; *March v. Paradise Mutual Ins. Co.*, 435 Pa.Super. 597, 646 A.2d 1254 (1994), *appeal denied*, 540 Pa. 613, 656 A.2d 118 (1995). It is also clear that—at least in some circumstances—an insurer has a "duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies. . . ." *Dercoli v. Pennsylvania Nat. Mutual Ins. Co.*, 520 Pa. 471, 554 A.2d 906, 909 (Pa.1989). *But cf. Hofkin*, 1995 WL 394118 at 8–9, 1995 U.S. Dist. LEXIS 9447 at *22–24 (appearing to interpret *Dercoli* to apply to situations where an insurer actually counsels the insured or where the insured is not represented by counsel). In *Polselli v. Nationwide Mutual Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir.1994), where an insurer was alleged to have acted in bad faith by failing to adjust and pay a claim in a timely manner, the

---

**5.** I have previously addressed defendant's argument that § 8371 is unconstitutional and concluded that: (1) § 8371 is constitutional; (2) in a federal court action pursuant to § 8371 a party is entitled to a jury trial with respect to a claim for punitive damages but not with respect to the other remedies available under the statute; and (3) plaintiffs were not entitled to an award of interest and counsel fees pursuant to § 8371. *See Younis Bros. & Co., Inc. v. Cigna Worldwide Ins. Co.*, 882 F.Supp. 1468 (E.D.Pa.1994); *Youn-*

*is Bros. & Co., Inc. v. Cigna World Wide Ins. Co.*, No. 91–6784, 1995 WL 118211 (E.D.Pa. Mar. 10, 1995).

**6.** The definition of bad faith adopted by courts in reviewing § 8371 claims is that contained in Black's Law Dictionary, sixth edition, and provides that bad faith "on the part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy See *Polselli*, 23 F.3d at 751.

Court of Appeals instructed the district court to consider an insurer's "delay in responding to communications from [its insured], its poor response time in engaging an investigation and in conducting the investigation and its handling of settlement negotiations...." In *Kiewit,* 44 F.3d at 1206 & n. 39, however, the Court of Appeals held that because the insurer had no duty to defend or indemnify its insured could not maintain a bad faith cause of action.

No common law action for bad faith conduct by an insurer existed under Pennsylvania law prior to the enactment of § 8371. *See D'Ambrosio v. Pennsylvania Nat. Mutual Casualty Ins. Co.,* 494 Pa. 501, 431 A.2d 966 (1981). Rather, the Pennsylvania Legislature regulated claim investigation practices through the Unfair Insurance Practices Act which was held to be the exclusive remedy for alleged improper or tortious conduct by an insurer prior to the enactment of § 8371. 40 P.S. § 1171.5(a)(10); *see Williams v. State Farm Mutual Auto Ins. Co.,* 763 F.Supp. 121, 123–25 (E.D.Pa.1991). I find no basis for a conclusion that the Legislature intended to create a broad ranging private enforcement mechanism with respect to the handling of claims via § 8371. I therefore conclude that an insurer's investigation and adjustment of a claim does not support an action under § 8371 where an insured's claim for coverage fails upon its merits and the insurer's actions in handling the claim would not have been actionable under Pennsylvania common law prior to the enactment of § 8371.

*The Parties' Motions For New Trial*

As an initial matter, I conclude that plaintiffs' motion for a new trial is without merit. The remarks of defendant's counsel regarding his professional history and impending wedding anniversary were unrelated to the issues before the jury and did not taint or prejudice the jury. I will not revisit plaintiffs' claim that defendant's counsel impermissibly used peremptory strikes to disqualify members of the panel on racial grounds because I conclude that I properly addressed and resolved that issue when it was first raised by plaintiffs' counsel. *See Batson v.*

*Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

■ Having granted defendant's motion for judgment n.o.v. I am required by Fed. R.Civ.P. Rule 50(c) to rule on defendant's motion for a new trial. Should my grant of judgment n.o.v. be vacated or reversed I would grant defendant a new trial on both the war risk exclusion and the bad faith issue because: (1) I erroneously instructed the jury with respect to ambiguity in the insurance policies prior to the jury's Phase I deliberations; and (2) I conclude that the jury's determinations with respect to the war risk exclusion and bad faith were against the weight of the evidence.

■ A federal court must look to federal rather than state law "in determining whether, in a contractual dispute, a given issue is to be decided by the trial judge as a matter of law or by the jury or judge as fact finder." *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co.,* 802 F.2d 667, 671 (3d Cir.1986); *see also Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 84 (3d Cir.1960) (in a diversity case the division of functions between the court and the jury is controlled by federal law), *cert. denied, Schenley Indus., Inc. v. Lind,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). In general, a district court may grant a motion for new trial pursuant to Fed.R.Civ.P. Rule 59 if it determines that the verdict is inconsistent with substantial justice because "the verdict is against the weight of the evidence; the damages are excessive; the trial was unfair; [or] that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions." *Northeast Women's Center, Inc. v. McMonagle,* 689 F.Supp. 465 (E.D.Pa.1988) *aff'd in relevant part,* 868 F.2d 1342 (3d Cir.1989); *see also* Wright, Miller & Kane, Federal Practice and Procedure; Civil 2d § 2805; Fed.R.Civ.P. Rule 61 ("[n]o error ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice"). The decision to grant or deny

such a motion rests in the discretion of the trial court. *Lind,* 278 F.2d at 88.

When the basis for the motion is an erroneous instruction to the jury a trial court will not normally grant a new trial unless the moving party brought the erroneous instruction to the court's attention at trial. See Fed.R.Civ.P. Rule 51. When the movant seeks a new trial on the basis that the verdict is against the weight of the evidence the trial court is to employ a standard "substantially less demanding than that for judgment as a matter of law." *Lightning Lube, Inc. v. Witco Corp.,* 802 F.Supp. 1180, 1185 (D.N.J.1992) *aff'd,* 4 F.3d 1153 (3d Cir. 1993). The trial court may consider the credibility of witnesses and weigh the evidence to determine whether a new trial is necessary to prevent a miscarriage of justice. *Roebuck v. Drexel Univ.,* 852 F.2d 715, 736 (3d Cir.1988); *see* Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2806. The trial court, however, is "not to substitute its own judgment for that of the jury simply because the court might have come to a different conclusion." *Lightning Lube,* 802 F.Supp. at 1186 (quotation and citations omitted). A court granting a new trial merely because of its disagreement with the verdict effects a denigration of the jury system to the extent the judge usurps the prime function of the jury as the trier of facts. *See id.* (quotation and citations omitted).

In this case defendant strenuously and repeatedly objected to the Court's charge with respect to ambiguity and argued that "[b]efore the jury as fact-finder, could consider whether the policy was ambiguous, the Court had to determine that a possible ambiguity existed." See Defendant's letters of March 14 and March 16, 1994. I ruled against defendant and in accordance with plaintiffs' request charged the jury as follows:

Now, the insurance policies define many of the terms that are relevant to resolving the dispute between parties, and because the policy constitutes the contract between parties the defining of certain terms in the policy are binding on the parties and binding on you as jurors in deciding the facts in this case.

If you should find that a material term of the policy is ambiguous, you [must] construe or interpret that ambiguity against the defendant and in favor of the plaintiffs.

A term or a provision of an insurance policy is ambiguous if reasonably intelligent persons on considering it in the context of the entire policy could honestly differ as to its meaning.

Charge to Jury, March 18, 1994, at 32. This charge constituted clear error under both federal and Pennsylvania law which mandates that "[i]t is for the court, as a matter of law, to determine whether ambiguity exists in a contract." *Kiewit,* 44 F.3d at 1199 *citing Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 at 390 (1986).

In Phase I of its deliberations the jury was required to determine whether; (1) plaintiffs had established that their losses "were direct loss by riot or civil commotion or direct loss from pillage and looting occurring during and at the immediate place of a riot or civil commotion"; and (2) defendant had established that plaintiffs' losses "were cause directly or indirectly by insurrection, rebellion, revolution, civil war or action taken by governmental authority in hindering, combating or defending against such an occurrence." Though charged on the definitions of the terms "insurrection" and "civil commotion" contained in plaintiffs' policies the jury requested further definition of these terms after retiring to deliberate. I did not embellish the definitions provided in my original charge. The jury found for plaintiffs with respect to both questions.

In *Glazer v. Glazer,* 374 F.2d 390 (5th Cir.1967), *cert. denied,* 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967), the Court refused to grant a new trial where the trial court instructed the jury on the issue of ambiguity but failed to "specifically state whether it found the contract ambiguous as a preliminary matter." *Id.* at 412. The Court concluded that the submission of the charge to the jury amounted to an "implied recognition

of the agreement's ambiguity." *Id.* As I have already concluded that the terms insurrection, rebellion, revolution, civil war or usurped power are not ambiguous, the holding of *Glazer* is not relevant to the present controversy. Further, when I charged I did not intend to recognize that the policy was ambiguous; I intended to do what plaintiffs had urged me to do—that is, to leave it to the jury to determine whether the language of the policy was ambiguous.

As I have stated, in my view the evidence presented to the jury establishes that insurrection, rebellion, revolution or civil war existed in Liberia at the time of plaintiffs' losses and that that insurrection caused plaintiffs' losses within the meaning of the policies. I conclude that the jury's verdict with respect to the war risk exclusion provisions contained in plaintiffs' policies is contrary to the clear weight of the evidence and that should the judgment n.o.v. be vacated or reversed a new trial on that issue and on defendant's alleged bad faith is necessary to prevent a miscarriage of justice.

*ORDER*

AND NOW this 15th day of September, 1995, for the reasons stated in the accompanying memorandum, judgment is entered against plaintiffs and in favor of defendant with respect to all of plaintiffs' claims. This Order is a final Order with respect to all pending post-trial motions and any other outstanding motions, all of which are DENIED except as provided in the accompanying memorandum.